UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

DEUTSCHE ALT-A SECURITIES MORTGAGE
LOAN TRUST, SERIES 2006-OA1, by HSBC
Bank USA, National Association, as
Trustee,

                      Plaintiff,

      - against -

DB STRUCTURED PRODUCTS, INC.,

                      Defendant.

------------------------------------

                                        12 Civ. 8594 (RWS)

                                        OPINION


A P P E A R A N C E S:


        Attorneys for Plaintiff DEUTSCHE ALT-A
        SECURITIES LOAN TRUST, SERIES 2006-OA1

        HOLWELL SHUSTER & GOLDBERG LLP
        125 Broad Street, 39th Floor
        New York, NY 10004
        By:  Michael S. Shuster, Esq.
             Lani A. Perlman, Esq.
             Eileen M. DeLucia, Esq.


        Attorneys for Defendant DB STRUCTURED
        PRODUCTS, INC.

        SIMPSON THACHER & BARTLETT LLP
        425 Lexington Avenue
        New York, NY 10017
        By:  Thomas C. Rice, Esq.
             David J. Woll, Esq.
             Isaac M. Rethy, Esq.

**Sweet, D.J.**

Defendant DB Structured Products, Inc. ("DBSP") moves pursuant to Rule 12(b)(6) to dismiss the First Amended Complaint ("FAC") filed by Plaintiff HSBC Bank USA ("HSBC" or "Plaintiff"). For the reasons set forth below, Defendants' Motion to Dismiss is granted in part and denied in part.

## I. *PRIOR PROCEEDINGS*

Plaintiff HSBC initiated this action on November 27, 2012, at the direction of Monarch Alternative Capital LP ("Monarch"), a "distressed debt" investment fund that purchased residential mortgage-backed securities ("RMBS") certificates issued by Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-OA1 (the "Trust"), nearly six years after the transaction at issue.

On January 14, 2013, DBSP moved to dismiss the complaint and on February 4, 2013, Plaintiff filed the FAC. This motion was heard and marked fully submitted on May 22, 2013.

## II. *BACKGROUND*

This dispute arises out of two related agreements (the "Agreements") executed in connection with the formation of the Trust and its issuance of RMBS. DBSP created the Trust, Series 2006-OA1, for the purpose of holding mortgage loans that DBSP

1

"securitized" into RMBS to ultimately be sold to investors.
(Compl. ¶¶ 38-39.)  DBSP, as "sponsor" of the securitization,
selected the mortgage loans to be securitized.  (*Id.* ¶ 38.)
Specifically, DBSP first purchased loans from mortgage
originators, and then transferred a pool of these loans to
Deutsch Alt-A Securities, Inc. ("DBALT"), a securitization
conduit known as a "depositor," pursuant to a Mortgage Loan
Purchase Agreement (the "MLPA") dated December 29, 2006 (the
"Closing Date"), which contains representations and warranties
("RWs") concerning the loans. (MLPA § 6.)  Next, the loans, as
well as DBALT's rights under the MLPA, were transferred to the
Trustee, pursuant to the Trust's governing contract, a Pooling
and Servicing Agreement dated December 1, 2006 (the "PSA").
(PSA § 2.1.)[1]  DBSP, pursuant to the MLPA, then issued
certificates which entitled their holders to shares of the
mortgage payments made by the borrowers on the underlying loans.

---

[1] The parties to the PSA are DBALT, as Depositor; HSBC Bank USA, National
Association ("HSBC"), as Trustee; and Wells Fargo Bank, N.A., as Master
Servicer and Securities Administrator.  HSBC, as Trustee, takes action on
behalf of the Trust.  The Master Servicer oversees the servicing of the
mortgage loans and aggregates monthly servicing reports and remittances.  The
Securities Administrator distributes payments to the Certificateholders in
accordance with the priorities established by the PSA, monitors the
performance of the securitization, and distributes monthly reports to
investors.  The MLPA and PSA are both governed by New York law.  *See* PSA §
11.4; MLPA § 17.

In the course of purchasing the RMBS and determining which loans to place into the securitization trust, DBSP performed due diligence on the loans.  (Compl. ¶¶ 3, 11-12, 31, 41, 61-62.) Plaintiff alleges that this due diligence included reviewing the loans, making judgments that the loans and the borrowers were what they appeared to be, confirming that the information in the Loan Files was accurate and that the loans were originated in accordance with the loan originators' stated mortgage loan origination guidelines, and determining whether the loans were appropriate collateral for certificates to be marketed and sold to the public.  (*Id.* ¶ 41.)  In the course of its review, DBSP had access to and possession of the Loan Files.  (*See* MLPA § 4(a); *see also* Compl. ¶¶ 8-9, 41-43, 71.)  Plaintiff contends that in the course of this review, DBSP discovered, or should have discovered, that many of the Mortgage Loans were not originated in accordance with the originators' stated underwriting practices; that many Loan Files were materially incomplete; that borrowers' incomes were overstated; that borrowers' indebtedness was understated; that the mortgaged properties were often misstated to be the borrowers' primary residences; and that the loans suffered from other obvious deficiencies.  (Compl. ¶¶ 11-12, 54-64.)

3

Knowledge of any of these deficiencies would result in a material breach of DBSP's RWs regarding the quality of the Mortgage Loans, triggering DBSP's repurchase obligation. Specifically, section 7(a) of the MLPA requires that DBSP repurchase breaching loans within 90s days of either its own discovery of such breaches, or its receipt of notice from the Depositor or its assignee (the Trustee) as to such breaches. The MLPA provides in relevant part that,

> Upon discovery by the Seller [i.e., DBSP], the Purchase [i.e., DAAS], or any assignee . . . of . . . a breach of any of the representations and warranties contained in Section 6 that materially and adversely affects the value of any Mortgage Loan or the interest therein of the Purchaser or the Purchaser's assignee, transferee or designee, the party discovering such breach shall give prompt written notice to the Seller.  Within sixty (60) days of its discovery or its receipt of notice . . . the Seller [DBSP] promptly shall . . . cure such breach in all material respects or, in the event that the Seller . . . cannot cure such . . . breach, the Seller shall, within ninety (90) days of its discovery or receipt of notice . . . . (i) repurchase the affected Mortgage Loan . . . .

(MLPA § 7(a).)  Section 2.3(a) of the PSA affirms DBSP's obligation to promptly cure or repurchase breaching loans upon discovery or receipt of notice.

The Complaint alleges that despite these obligations, DBSP, as a result of its own pre-closing due diligence, was aware when the securitization closed and immediately thereafter of hundreds

4

of breaches of its RWs concerning the Mortgage Loans, and
nevertheless failed to cure any breach or repurchase any loan.
(Compl. ¶¶ 11, 54-64, 76.)  Plaintiff contends that this failure
to cure or repurchase despite knowledge of material breaches
resulted in DBSP breaching its obligations under the Agreements.
(*Id.*)

Approximately five years after the securitization, a
certificateholder performed its own due diligence on the loans
(*id.* ¶¶ 44-46), discovered the breaches that Plaintiff alleges
DBSP knew, or should have known, from its initial due diligence,
(*id.* ¶¶ 1, 3, 48, 62), and provided notice of these breaches to
the Trustee, which transmitted this information to DBSP.  (*Id.*
¶¶ 2, 67.)  Specifically, on November 16, 2011, a law firm
representing Monarch sent a letter to the Trustee noticing
beaches of RWs concerning 38 loans, and requested that the
Trustee notify DBSP of such breaches and request repurchase of
the loans.  (Declaration of Isaac M. Rethy, "Rethy Decl."; Ex.
A.)  This letter was forwarded to DBSP on December 1, 2011,
noting that the Monarch letter "identifie[d] mortgage loans that
may have breached certain representations and warranties." (*Id.*)
DBSP responded by letter dated February 23, 2012, stating that
DBSP needed to review these loans to determine whether any

5

breached RWs, and requesting loan documents to make this
determination.[2]   (Rethy Decl. Ex. B.)

In June of 2012, the Trustee forwarded DBSP five additional
letters from Monarch which asserted further breaches.   (Rethy
Decl. Exs. D-F, H-I.)   In these letters, the Trustee wrote that
it had "not conducted any independent review of the facts
asserted and ma[de] no representations as to the accuracy of the
information contained herein."   (*Id.*)   DBSP contends that it
responded to the Trustee by letter dated August 14, 2012,
reiterating its need to assess the underlying loan documentation
in order to determine whether repurchase was required.   (*Id.* Ex.
J.)   These requested documents were provided to DBSP on October
3, 2012, accompanied by a letter asserting that the Trustee had
no obligation to provide DBSP any supporting information or to
investigate any breach allegations made by certificateholders.
(*Id.* Ex. K.)   The Letter also asserted that the time period
allotted for DBSP to repurchase the 323 loans had already
expired.   (*Id.*)

In total, the Trustee sent DBSP six breach notices (the
"Breach Notices") concerning a total of 323 loans (the

_____
[2] Defendant maintains that once the loans were transferred to the Trust, loan
documents necessary for analysis of RW breaches passed out of DBSP's control.
(*See* PSA § 2.1) (transferring "all the right, title and interest" in the
loans to the Trust).

6

"Breaching Loans").  Each Breach Notice identified each
individual Breaching Loan by its unique loan identification
number, as well as identifying the specific RWs of the MLPA that
DBSP had breached; providing a description of the facts and
circumstances giving rise to those breaches; and explaining how
those breaches materially and adversely affected the interest of
the certificateholders in each of the Breaching Loans.  (*Id.* ¶¶
68-72.)  Plaintiff maintains that this notice, as with DBSP's
own discovery of the breaches prior to the closing of the
securitization, contractually required DBSP to either cure its
breaches within 60 days or repurchase the Breaching Mortgage
Loans within 90 days.  (*See* MLPA § 7(a), PSA § 2.3(a).) DBPS to
date has not cured or repurchased any of the loans at issue.

The Complaint alleges breach of contract for both the
initial alleged breach by DBSP, arising from its own discovery
and knowledge of breaches of RWs at the time of closing, as well
as the second, distinct set of alleged breaches arising from
DBSP's failure to act upon the Trustee's Breach Notices.
Plaintiff asserts that the underlying breaches of the RWs
materially and adversely affected the risk profile and, thus,
the value of each Breaching Loan, as well as the entire
securitization itself, given that the Breaching Loans comprised
some 21% of the entire pool of Mortgage Loans.  (Compl. ¶¶ 1-2,

7

11.)   In conveying such a heavily tainted securitization pool to the Trust, and in refusing to perform its obligations, Plaintiff further alleges that DBSP has distorted the Agreements and frustrated the core purpose of the parties' contractual arrangements, thereby committing a fundamental breach of the Agreements.  (*Id.* ¶ 17.)

The PSA allows Plaintiff the ability, in accordance with procedures set forth in Section 2.3 of the PSA (the "Repurchase Protocol"), to enforce DBSP's obligation to repurchase a loan that breaches the RWs made in the MLPA.  The Repurchase Protocol provides:

> Upon discovery or receipt of notice . . . of a breach by [DBSP] of any [RW] in respect of any Loan that materially and adversely affects the value of such Loan, or the interest therein of the Certificateholders, the Trustee shall promptly notify [DBSP] of such . . . breach and request that [DBSP] . . . cure such . . . breach within 60 days from the date [DBSP] was notified of such . . . breach. . . . If [DBSP] does not . . . cure such . . . breach in all respects during such period, the Trustee shall enforce the obligations of [DBSP] under the [MLPA] to repurchase such Loan from the REMIC I at the Purchase Price within 90 days after the date on which [DBSP] was notified of such . . . breach.  . . . It is understood and agreed that the obligation of [DBSP] to cure or to repurchase (or to substitute for) any Loan as to which  . . . such a breach has occurred and is continuing shall constitute the sole remedy respecting such . . . breach available to the trustee and the Certificateholders.

(PSA § 2.3.)

In turn, Defendant maintains that Plaintiff's Complaint, in the face of clear terms of the PSA, attempts to sue for RW breaches without providing sufficient prior notice, and that Plaintiff is incorrect that it can obtain "rescissory" and other measures of damages, given the PSA's express limitation of remedies.   The PSA, Defendant maintains, clearly provides that the loan-by-loan Repurchase Protocol set forth in Section 2.3 for specific performance "shall constitute the sole remedy respecting such omission, defect or breach available to the Trustee and the Certificateholders."  Additionally, Defendant asserts that the FAC does not allege that any of the breaches alleged by Monarch pertained to assets of the Trust.   The PSA provides that DBSP has no obligation to repurchase mortgage loans that are no longer assets of the Trust or have otherwise been extinguished.  (Def. Mem. at 5.)  Because Plaintiff has not specified which, if any, of their breach claims pertain to loans still the property of the Trust and capable of being repurchased, Defendant maintains that Plaintiff's claims must be dismissed.

## III. STANDARD OF REVIEW

On a motion to dismiss pursuant to Rule 12(b)(6), all factual allegations in the complaint are accepted as true, and all inferences are drawn in favor of the pleader. *Mills v. Polar*

9

*Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir. 1993). The issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir. 1995) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 235-36 (1974)).

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). Plaintiffs must allege sufficient facts to "nudge[ ] their claims across the line from conceivable to plausible." *Twombly,* 550 U .S. at 570. Though the court must accept the factual allegations of a complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 555).  In ruling on such a motion, "the court may consider any written instrument attached to the complaint as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint." *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005).  "Where a contract's language is

10

clear and unambiguous, a court may dismiss a breach of contract claim on a Rule 12(b)(6) motion to dismiss." *Maniolos v. U.S.*, 741 F. Supp. 2d 555, 567 (S.D.N.Y. 2010) (citing *Advanced Mktg. Grp., Inc. v. Bus. Payment Sys., LLC*, 300 F. App'x 48, 49 (2d Cir. 2008)).

## IV.  PLAINTIFF'S COMPLAINT SUFFICIENTLY ALLEGES BREACH OF CONTRACT

The Complaint alleges breaches of contract by DBSP at two distinct points in time: First, when DBSP discovered the underlying breaches of RWs at the time of the securitization and therefore had an immediate obligation to replace, cure or repurchase the Breaching loans; and, second, when the Trustee put DBSP on notice of these same breaches several years later, which again triggered DBSP's obligation to cure or repurchase. (Compl. ¶¶ 1-3, 11-12, 41, 76, 82-83.)  DBSP has, to date, refused to repurchase or cure any Breaching Loan.  (*Id.* ¶¶ 96-106.)

With respect to Plaintiff's first assertion, DSBP contends that the Complaint's allegations that DBSP knew, or should have been aware, of the Breaching Loans from its own discovery process are too "conclusory," and insufficient to establish a claim for breach of contract.  (Def. Mem. at 16.) The Complaint, however, alleges detailed factual allegations regarding the apparent breaches in the loans, and DBSP's due diligence

11

process. (*See* Compl. ¶¶ 3, 8-9, 1—12, 31, 41, 61-63.) The Complaint shows that DBSP's "due diligence involved a thorough review of documentation relevant to each and every Mortgage Loan in relation to each representation and warranty," in accordance with standard practices for securitization sponsors. (*Id.*) Additionally, the subsequent Forensic Review uncovered pervasive breaches, including patently unreasonable stated borrower incomes and violations of applicable underwriting requirements, which allegedly existed at the time of closing and are observable within the four corners of the Loan Files. (*Id.*) Plaintiff contends that "it is not commercially plausible" to infer that DBSP, during even a passing due diligence review, would not uncover such obvious and severe breaches. (*Id.* ¶ 62.); *see also Morgan Guar. Trust Co. of N.Y. v. Bay View Franchise Mortg. Acceptance Co.*, 2002 WL 818-82, at \*5 (S.D.N.Y. Apr. 30, 2002). Moreover, the parties agree that if DBSP had discovered these underlying breaches, it had an immediate obligation to cure the breaches or repurchase the loans without notice or action from the Trustee. (*See* MLPA § 7(a)); *see also Trust for the Cert. Holders of the Merrill Lynch Mortg. Pass-Through Certs. Series 1999-C1 v. Love Funding Corp.*, No. 04 Civ. 9890, 2005 WL 2582177, at \*7 (S.D.N.Y. Oct. 11, 2005) ("Defendant's obligation is independent of its receipt of prompt

12

written notice because, under the terms of the contract, the
obligation can also arise upon its own discovery).  These
allegations, taken in the light most favorable to Plaintiff, are
sufficient to establish a breach of contract claim at this
stage.  *See, e.g. Arista Records, LLC v. Doe 3*, 604 F.3d 110,
120 (2d Cir. 2010) (allegations "upon information and belief"
are sufficient where "the facts are peculiarly within the
possession and control of the defendant, or where the belief is
based on factual information that makes the inference of
culpability plausible.").

With respect to DBPS's second alleged breach of contract,
triggered upon receiving the Breach Notices, DBSP contends that
Plaintiff failed to "demonstrate its own compliance under the
contract" by not establishing sufficient notice necessary to
enforce DBSP's repurchase obligation.  *See Plotch v.
CitiMortgage, Inc.*, 2012 WL 1049991, at *3 (Sup. Ct. N.Y. Cty.
Mar. 13, 2012) ("Where the plain language of the contract
establishes obligations on the other party that have not been
met, dismissal is warranted.").

The Repurchase Protocol requires that the Trustee provide
DBSP with "prompt" notice, "in writing," that specific loans
materially breached specific RWs, and then must provide DBSP
with 60 days to cure or 90 days to repurchase the loans.  (PSA §

13

2.3(a); MLPA § 13.)   Only after notice has been given and this
period has expired, without the breaches being cured or the
loans being repurchased, can the Trustee bring suit to enforce
DBSP's obligations to repurchase the loans.   *Id.* DBSP argues
that here, Plaintiff did not meet these obligations because its
notice was neither "prompt" nor "proper": Plaintiff forwarded
Monarch's concern over five years after the Closing Date, and
expressly disclaimed the accuracy of the material, stating that
the Trustee "ha[d] not conducted an independent review" and
"ma[de] no representation as to the accuracy" of the
allegations.   (Rethy Decl. Exs. D-F, H-I.); *see also MASTR Asset
Backed Securities Trust 2006-HE3 v. WMC Mortg. Corp.,* 2012 WL
4511065, at *7 (D. Minn. Oct. 1, 2012) ("*WMC II*")("In light of
the purpose of the repurchase remedy, the Court fails to see how
notice following foreclosure can be 'prompt.').   Forwarding
correspondence from third parties five years after the Closing
Date without verifying the accuracy of the information,
Defendant asserts, is not "prompt" or "proper" notice under the
Repurchase Protocol and thus disqualifies Plaintiff's claims for
breach of contract.   *See WMC I*, 843 F. Supp. 2d at 1000 (Claims
"for which [plaintiff] has yet to give [defendant] notice and an
opportunity to cure . . . must be dismissed.)

First, DBSP is incorrect that the timing of Plaintiff's
notice is not "prompt."  The Trustee transmitted the Breach
Notices to DBSP, on average, within seven days of receiving them
from the shareholder.  (Rethy Decl. Ex. A, D-F, H-I.)  Notice
given within two months of discovery of an alleged breach of
contract is deemed reasonable under New York law.  *See LaSalle
Bank N.A. v. Lehman Bros. Holdings, Inc.*, 238 F. Supp. 2d 618,
637 (D. Md. 2002) (applying New York law). Further, the MLPA
expressly provides that DBSP's obligations, representations and
warrants not only survive the closing of the transaction, but
"shall continue in full force and effect . . . [and] remain
enforceable for the life of the securitization and beyond."
(MLPA § 16); *see also ACE Securities Corp. Series 2006-SL2 v. DB
Structured Products, Inc.*, 965 N.Y.S.2d 844, 849 (Sup. Ct. N.Y.
Cty. 2013)("DBSP has a 'recurring obligation' under the PSA to
follow the Repurchase Protocol when it is informed of a problem
with a Representation."); *N.Y. Cent. Mut. Fire Ins. Co.,* 90
A.D.3d at 1642, 936 N.Y.S.2d 815.  Therefore, the time elapsed
since the Closing Date is irrelevant in evaluating whether
Plaintiff's notice was "prompt."

Second, Plaintiff's notice was "proper," and, in fact, more
than complied with the minimal notice requirements in the
Agreements.  The Breach Notices specified (1) each of the 323

15

Breaching Loans by its unique number; (2) requested DBSP fulfill
its obligation to cure or repurchase within the time frame
specified in the PSA; (3) detailed the specifiec RWs in the MLPA
that were preached with respect to each affected loan; (4)
provided a description of the facts and circumstances giving
rise to such breaches; and (5) attached "thousands of pages of
material which supported these conclusions." (*See* Compl. ¶¶ 68,
70-72.)  DBSP points to no provision in any agreement, nor does
such a provision exist, suggesting that the Trustee is required
to conduct an independent investigation to "verify" any breaches
it brings to DBSP's attention.  To the contrary, the PSA
expressly provides that the Trustee "shall [not] be bound to
make any investigation into the facts or matters stated in any .
. . notice" it receives with respect to the Trust.  (PSA §
8.2(a)(v).)  Likewise, the MLPA states that the failure of any
party to "conduct any partial or complete examination of the
Mortgage [Loan] Files shall not affect the rights of the
Purchaser or any assignee, transferee or designee of the
Purchaser [i.e., the Trustee] to demand repurchase or other
relief as provided herein or under the [PSA]."  (MLPA § 4(e);
*see also id.* § 7(a) ("The representations and warranties
contained in Section 6 [with respect to the Mortgage Loans]
shall not be impaired by . . . any failure on the part of the

16

Seller or the Purchaser to review or examine such documents and
shall inure to the benefit of . . . the Trustee for the benefit
of the Certificateholders.").

Independently, even if the provisions in the MLPA or PSA
dictated notice requirements which Plaintiff may have violated,
the sufficiency of the Breach Notices is an issue of fact not
appropriate for resolution at this stage.  *See, e.g.*, *BNP
Paribas Mortg. Corp.*, 778 F. Supp. 2d at 399 ("Ultimately, the
question of whether [certain documents] contained sufficient
written notice under the [parties' agreement] is an issue of
fact not appropriate for resolution on a motion to dismiss.");
*N.Y. Overnight Partners, L.P. v. The Rizt-Carlton Hotel Co.*, No.
95 Civ. 0122, 1995 WL 649908, at *1 (S.D.N.Y. Nov. 3, 1995)
(finding that sufficiency of notice presents factual issues that
cannot be resolved on a motion to dismiss, and noting that "the
meaning and intent of the notice-and-cure provisions may be
illuminated during discovery").  As such, for the purposes of
this motion, DBPS's failure to repurchase or cure despite
receiving Plaintiff's Breach Notices is sufficient to establish
a breach of contract claim.

     1. The FAC Sufficiently Alleges Breach of Contract even with
       Respect to Loans not the Subject of the Breach Notices

Defendant asserts that should Plaintiff's breach of
contract claims survive, Plaintiff is only entitled to bring

claims regarding loans for which it has previously been given
notice of RW breaches.  *See WMC I*, 843 F. Supp. 2d at 1000
(claims "for which [plaintiff] has yet to give [defendant]
notice and an opportunity to cure . . . must be dismissed.").

However, DBSP is obligated "to repurchase breaching loans
upon either notice *or* discovery."  (MLPA § 7(a)) (emphasis
added.) Plaintiff alleges that "[o]n information and belief,
through its due diligence efforts and therefore on or prior to
December 29, 2006 [the closing date], DBSP discovered" numerous
breaches, including breaches not specifically listed in the
Breach Notices.  (FAC ¶ 76.) As such, DBSP's obligation to
repurchase would have been triggered upon its own discovery and
does not require notice by Plaintiff.  *See Flagstar I*, 2011 WL
5335566, at *5 ("[U]nlike the 'sole remedy' provisions discussed
*supra*, notably absent [from the notice and opportunity to cure
provision] is any indication that the parties intended this
'notice and opportunity to cure' process to be the exclusive
means by which [plaintiff could] enforce its rights under the
Transaction Documents. . . . Rather, [defendant's] cure or
repurchase obligations are triggered merely by [defendant]
'becoming aware of' a breach.").[3]  Whether these loans did, in

---

[3] In *Flagstar I*, the court went on to note that because of the material
uniformity of the underlying loan population, plaintiff's notification to
defendant of "pervasive breaches" affecting the loans was sufficient to

fact, breach the RWs and whether DBSP knew, or should have
known, of these breaches at the time of its review, is a
question of fact. It would therefore be premature to dismiss
Plaintiff's claims as to loans which are not the subject of any
Breach Notices at this stage.[4] *See, e.g., Silverman v. Mutual
Ben. Life Ins. Co.*, 138 F.3d 98, 104 (2d Cir. 1998) ("A material
question of fact existed" as to whether defendant had knowledge
of breach of fiduciary duty).

### 2. Plaintiff is Restricted to the Remedies as Provided in the Relevant Agreements

Plaintiff's first cause of action for breach of contract is
for general damages.  With respect to Plaintiff's remedies, the
MLPA states, in relevant part, that:

> The obligations of [DBSP] set forth in this Section 7 to cure
> or repurchase a defective mortgage loan . . . constitute the
> sole remedies . . . against [DBSP] respecting . . . a breach
> of the representations and warranties contained in Section 6.
> It is understood and agreed that the obligations of the Seller

---

render the defendant "constructively aware -or, at minimum put [defendant] on
inquiry notice of the substantial likelihood that these breaches extended
beyond" the specified loans into the "broader loan portfolio." *Id.*  The court
therefore allowed claims to remain as to loans which were not the subject of
previous notices to the defendant.

[4] "The Trustee's failure to set forth which of the specific loans are affected
by false Representations is not fatal to the Complaint because CPLR 3016(b)'s
particularity requirements do not apply to a breach of contract claim. Unlike
similar cases, plaintiff does not allege fraud. Nonetheless, given the
specificity requirements in Repurchase Protocol, the specific identification
of which loans have been affected by false Representations is fair game for
interrogatories." *ACE Securities Corp. Series 2006-SL2 v. DB Structured
Products, Inc.*, 965 N.Y.S.2d 844, 849 (Sup. Ct. N.Y. Cty. 2013).

. . . to cure or repurchase a defective Mortgage loan . . .
constitute the sole remedies of the Purchaser against the
Seller respecting . . . a breach of the representations and
warranties contained in Section 6.[5]  All rights and remedies .
. . under this Agreement are distinct from, and cumulative
with, any other rights or remedies under this Agreement or
afforded by law or equity . . . .

(MLPA §§ 7(a); 7(c); 12.)[6]

     The parties disagree as to whether these provisions bar

Plaintiff from seeking monetary relief entirely, or whether, as

Plaintiff contends, DBSP's breach of its repurchase obligation

is an independent breach allowing separate monetary damages.

     Under New York law, exclusive remedy clauses are narrowly

construed.  "[A] remedy specified for breach of an individual

contract term is not necessarily a remedy for breach of other

terms in the contract." *Kemi, Inc. v. Berlitz Int'l, Inc.*, 228

A.D.2d 27, 27 (1st Dep't 1996.) However, it is black letter law

that the provisions of a contract or a related set of contracts

should be read as a whole and every effort should be made to

_____

[5] Section 2.3(a) of the Pooling and Servicing Agreement similarly states,
"[i]t is understood and agreed that the obligation of the Seller to cure or
to repurchase (or to substitute for) any Loan as to which . . . a breach
has occurred and is continuing shall constitute the sole remedy respecting such .
. . breach available to the Trustee and the Certificateholders."

[6] New York courts have respected "sole remedy" provisions as limiting liability
for breaches of contract. *See, e.g. Rubinstein v. Rubinstein*, 23 N.Y.2d 293,
298 (N.Y. 1968) (allowing exclusive remedy when language in provision was "to
be the sole remedy"); *Deutsche Lufthansa AG v. Boeing Co.*, 2006 WL 3155273,
at *5 (S.D.N.Y. Oct. 30, 2006) (when party used "the precise terminology
favored by the courts of New York, 'sole and exclusive remedy,' to limit the
remedies available to the non-defaulting party and to limit the amount each
could recover should there be a default.").

give them consistent meaning in their overall context. *See,
e.g., Perreca v. Gluck,* 295 F.3d 215, 224 (2d Cir.2002) (it is a
"cardinal principle of contract construction that a document
should be read to give effect to all its provisions and to
render them consistent with each other," and, accordingly, "all
provisions of a contract [should] be read together as a
harmonious whole, if possible."). Here, the MLPA and PSA
Agreements both explicitly state that specific performance is
the "sole" remedy available to Plaintiff for DBSP's breach of
any RWs contained therein. "In light of the Transaction
Documents' specificity in this regard," it cannot be, as
Plaintiff asserts, that "these limitations on their remedies
completely dissolve in the event that, as alleged here, [DBSP]
fails to 'cure or repurchase' the defective loans within the
applicable" period. *Assured Guaranty Municipal Corp. v.
Flagstart Bank, FSB*, No. 11 Civ. 2375, 2011 WL 5335566, at *5
(S.D.N.Y. Oct. 31, 2011) (hereinafter "*Flagstar I*").

Courts in this circuit have generally agreed with this
reasoning.  In *Sterling Fed. Bank, F.S.B. v. Credit Suisse
First Boston Corp.*, 2008 WL 4924926, at *12 (N.D. Ill. Nov. 14,
2008), for instance, the court, applying New York law, upheld
the "sole remedy" provision as barring damage claims since "the
very point of the breach of contract action against [defendant]

21

is that it has not cured, repurchased, or substituted any Mortgage Loan as to which breach has occurred and is continuing."

Similarly in *Nomura Asset Acc. Corp. Series 2005-S4 v. Nomura Credit & Capital, Inc.*, No. 653541/2011, slip op. at 13 (Sup. Ct. N.Y. Cty. May 10, 2013), the court likewise dismissed an action by plaintiff, holding that "[t]he repurchase obligation in this case is merely a remedy. It is not a duty independent of the Mortgage Representation breach of contract claims." There, the court explained that *LaSalle Bank N.A. v. Lehman Bros. Holdings, Inc.*, 237 F. Supp. 2d 618 (D. Md. 2002) (applying New York law), relied on by Plaintiff and holding that breaching a repurchase remedy is an independent breach, is "unpersuasive" and misapplies the First Circuit opinion upon which it relies. *See id.* Indeed, the court explained that the First Circuit opinion, *Resolution Trust Corp. v. Key Fin. Servs., Inc.*, 280 F.3d 12 (1st Cir. 2002) ("RTC") in fact expressly disclaimed reliance on this "independent breach" theory, and "does not hold that a failure to repurchase on demand constitutes an independent breach." *Id.* at 13.

Additionally, courts have upheld this reasoning and affirmed "sole remedy" provisions even where, as here, provisions in the agreements allow a plaintiff to "take whatever

22

action at law or in equity that may appear necessary" to enforce

defendants' obligations. (MLPA § 12.)[7]  As the court explained in

*Assured Gaur. Mun. Corp.*,

> The [transaction documents'] provision that [plaintiff] may
> "take whatever action at law or in equity that may appear
> necessary ... to enforce [Flagstar's] obligation" under the
> Transaction Documents, *see id.* § 5.02, [merely indicates]
> that the "sole remedy" provisions of the Transaction
> Documents do not preclude [plaintiff] from bringing suit
> against [defendant] in the event that, as alleged here,
> [defendant] refuses to comply with its repurchase
> obligations. [Because the transaction documents] *do*
> "expressly provide [ ]" for [defendants'] "cure or
> repurchase" obligation to be the exclusive remedy available
> to [laintiff] for [defendant's] breach of a representation
> or warranty . . . the Court finds unconvincing
> [plaintiff's] contention that these limitations on their
> remedies completely dissolve in the event that, as alleged
> here, Flagstar fails to "cure or repurchase" the defective
> loans within the applicable 30 day period.

2011 WL 5335566, at *5;[8] *see also Walnut Place LLC v. Countrywide*

*Home Loans, Inc.*, 96 A.D.3d 684, 684-5 (1st Dep't 2012) (a

repurchase "no action" provision in a PSA or MLPA "merely

---

[7] Section 12 of the MLPA concerns the grant of a lien on the loans in favor of
DBALT to protect its interest in the loans prior to closing, and does not
specifically pertain to the repurchase obligation.

[8] Plaintiff incorrectly cites this case as holding that breaching a repurchase
obligation is an independent breach.  Specifically, Plaintiff cites the
opinion's language that the sole remedy provision "d[id] not preclude
[plaintiff] from bringing suit" if the defendant "refuses to comply with its
repurchase obligations."  *Flagstar I*, at *5.  However, the context of this
quotation explains that the court meant only the plaintiff could bring suit
for repurchase to enforce this obligation.  In the post-trial ruling *Flagstar
II*, the court reaffirmed that repurchase was the "exclusive remedy," but
ruled that since the defendant "would be obligated to reimburse Assured for
the entirety of the claims Assured paid under a wide range of defect rates,"
recovery of the claims the plaintiff had paid out was consistent with this
remedy.  *Flagstar II*, at *37, 39.

23

provides for a remedy in the event of a breach," not independent grounds for a suit); *Centennial Ins. Co. v. Gen. Elec. Co.*, 253 N.W.2d 696, 697 (Mich. App. 1977) ("Plaintiff's alternative argument that the one year repair or replacement provision constitutes a separate contract, that was breached separately from the contract of sale, is without merit.   Plaintiff's argument is in essence that by failing to remedy its first rbeach, the defendant committed a second breach. . . . The fallacy of this approach is apparent.").

New York law, moreover, does not recognize pre-suit remedial provisions as constituting separate promises which can serve as the basis for independent causes of action.   Rather, under New York law, claims which are subject to pre-suit cure or demand requirements accrue when the underlying breach occurs, not when the demand is subsequently made or refused.   *See, e.g.*, *Hahn Auto. Warehouse, Inc. v. Am. Zurich Ins. Co.*, 18 N.Y.3d 765, 770-71 (N.Y. 2012) (Under New York law, "the cause of action accrues when the party making the claim possesses a legal right to demand payment . . . not when it actually made the demand."); *Cont'l Cas. Co. v. Stronghold Ins. Co., Ltd.*, 77 F.3d 16, 21 (2d Cir. 1996) ("where a right exists, but a demand is necessary to entitle a person to maintain an action," the claim accrues regardless of whether the demand has been made).

24

Plaintiff's cited precedent to the contrary is misplaced, as discussed above, or inapposite.  For instance, Plaintiff cites *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 2013 WL 1296525 (1st Dep't Apr. 2, 2013) as "affirming" the independent breach theory.  But Plaintiff quotes a section of the opinion that concerns application of an insurance law causation standard over an "across the board application of the common law," and the opinion does not anywhere discuss a sole remedy provision.  Similarly, neither of the two other cases Plaintiff cites, *Lehman Bros. Holdings, Inc. v. PMC Bancorp.*, No. 10-cv-07207m 2913 WK 1095458m at *4 (C.D. Cal. Mar. 8, 2013) and *Lehman Bros. Holdings, Inc. v. Key Fin. Corp.*, No. 09-cv-623, 2011 WL 1296731, at *11 (M.D. Fla. Mar. 31, 2011), involve a sole remedy or exclusive remedy provision; the fact they allow plaintiff to pursue general contract remedies for a loan seller's failure to repurchase upon demand is thus inapposite.  Even in *ACE Securities Corp. Series 2006-SL2 v. DB Structured Products, Inc.*, 965 N.Y.S.2d 844, 849 (Sup. Ct. N.Y. Cty. 2013), where the court explains that defendant commits an independent breach each time it fails its repurchase obligation for the purpose of the statute of limitations accruing, the court was clear that recovery was "limited to the [sole remedy provision] in the PSA."  *Id.* ("The degree to which bargained for remedies are

25

simple or convoluted is a matter for sophisticated commercial
actors to address before the execution of a contract. It is not
something to complain about in subsequent litigation."").
Defendant's failure to repurchase is thus not an independent
breach sufficient to invalidate the "sole remedy" provision.

### 3. Plaintiff's Restricted Remedies may Include Compensatory Damages, and Dismissal of Plaintiff's Compensatory Damages Claims is thus Premature at this Stage

Assuming that Section 7(a) was intended as a contractual
limitation on DBSP's liability for all breaches of RWs of the
MLPA, Plaintiff asserts that monetary damages are still
appropriate because liability limiting provisions are
unenforceable where, as here, the breaching party has been
grossly negligent or engaged in willful misconduct. *See, e.g.,*
*Soroof Trading Dev. Co., Ltd. v. GE Fuel Cell Sys. LLC*, 842 F.
Supp. 2d 502, 516 (S.D.N.Y. 2012) ("[A]n exculpatory agreement,
no matter how flat and unqualified in terms, will not exonerate
a party from liability . . . [for its] willful or grossly
negligent acts."); *North Triphammer Dev. Corp. v. Ithaca*
*Assocs.*, 704 F. Supp. 422, 426 (S.D.N.Y. 1989) (denying motion
to dismiss claim for monetary damages, holding that sole remedy
clause "does not relieve [defendant] of its liability in the
event of willful default"); *see also Gold Connection Discount*
*Jewelers, Inc. v. Am. Dist. Tel. Co., Inc.*, 212 A.D.2d 577, 578

26

(2d Dep't 1995) ("Although [limited liability] clauses in commercial contracts are enforceable for claims based on ordinary negligence, they will not preclude recovery in tort or breach of contract where the losses are the result of gross negligence.").

DBSP points to cases suggesting that "an allegation that a breach of contract was willful rather than involuntary does not allow a court to disregard an unambiguous limitation of liability provision agreed to by parties of equal bargaining power." *DynCorp v. GTE Corp.*, 215 F. Supp. 2d 308, 318 (SDNY 2002) (citing *Met. Life. Ins. Co. v. Noble Lowndes Int'l Inc.*, 84 N.Y.2d 430 (N.Y. 1994)); *see also Base Village Owner LLC v. Hypo Real Estate Capital Corp.*, 938 N.Y.S.2d 541, 541 (1st Dep't 2012) ("The limitation of remedies provision . . . clearly, explicitly and unambiguously barr[ed] plaintiff's claim for damages . . . [and] was not rendered ineffective by allegations of [intentional] misconduct"); *Morgan Stanley & Co. Inc. v. Peak Ridge Master SPC Ltd.*, 2013 WL 1099059, at *10 (S.D.N.Y. Mar. 15, 2013). However, the cases cited by Defendant do not bar Plaintiff from seeking compensatory damages at this stage. In *Morgan Stanley & Co. Inc.*, for instance, the plaintiff's allegations were found "insufficient to plead gross negligence or willful misconduct," and actual damages provided in the

27

contract where found sufficient.  Similarly, in *DynCorp v. GTE Corp.*, 215 F. Supp. 2d at 318, the court disallowed punitive damages where the contract banned such damages, and where actual damages sufficed to make plaintiff whole.  *Id.; see also Base Village Owner LLC*, 938 N.Y.S.2d at 541 (finding intentional misconduct irrelevant in light of defendant's "alleged economic self-interest"); *Metropolitan Life Ins. Co. v. Noble Lowndes Intl.*, 84 N.Y.2d 430, 438-439 (1994) (inadvertent versus willful conduct by defendant irrelevant where parties made cap on damages).

Here, unlike the cases Defendant cites, if Plaintiff's allegations are found to be true, DBSP willfully knew of material breaches of loans and failed to cure these breaches for more than five years, rendering the entire purpose of the cure-or-repurchase obligation meaningless.  (Compl. ¶¶ 5, 9, 43, 48, 80-81.)  In such circumstances, whether the Trustee's remedy is characterized as "compensatory damages," "rescissory damages," or "specific performance" thus has little practical significance given that the form of the relief (if not necessarily the quantum) is the same in each case: the payment of money to make Plaintiff whole.  *See, e.g., Flagstar II*, 2013 WL 44014, at *37 (rejecting defendant's argument that an award of money damages would "deprive [defendant] of its side of the contractual

28

repurchase bargain," requiring repurchase as sole remedy, where
the "contractual 90-day cure period [had] long since expired);
*Wells Fargo Bank, N.A.*, 2013 WL 1285289, at *10-11 (S.D.N.Y.
Mar. 28, 2013) (awarding repurchase price as measure of damages
to make plaintiff whole where loans were unavailable for
technical "repurchase"); *Sun Am. Bank v. Fairfield Fin. Servs.*,
690 F. Supp. 2d 1342, 1368 (M.D. Ga. 2010) ("whether repurchase
is construed as liquidated damages or specific performance, it
is a reasonable remedy for a serious breach with consequences
that cannot be measured."); *Orix Real Estate*, 127 F. Supp. 2d at
983 ("The payment of the liquidation price of a loan is payment
of an amount of money, which is completely fungible . . . There
is [thus] no practical difference between this 'repurchase'
remedy and compensatory damages."). Courts have agreed that an
award of monetary damages would therefore not "deprive
[defendant] of its side of the contractual repurchase bargain"
where, through Defendant's own fault, the "90-day cure period
has long since expired." *Flagstar II*, 2013 WL 44014, at *37; *see
also Resolution Trust*, 280 F.3d at 18 (rejecting defendant's
argument that the contractual repurchase remedy precluded award
of general contract damages, holding that "[w]hether or not
[defendant] committed an independent breach by failing to
repurchase on demand, the district court was free to make

29

[plaintiff] whole"). Dismissal of compensatory damages at this stage is thus premature. *See Orix Real Estate*, 127 F. Supp. 2d at 983 (applying Rule 54(c), rejecting argument that breach of warranty claim seeking compensatory damages must be dismissed based on PSA provision limiting remedies to cure or repurchase of breaching loans because, in either case, plaintiff would be entitled to "payment of an amount of money").

### 4. Plaintiff has Adequately Alleged Claims for Specific Performance

Plaintiff's third cause of action for breach of contract seeks to compel DBSP to repurchase the allegedly breaching loans pursuant to Section 2.3 of the PSA. Defendant contends that this claim must fail because Plaintiff failed to comply with contractually-mandated notice provisions, and because Plaintiff "indiscriminately asserts claims for 'repurchase' of loans that were liquidated or otherwise ceased to exist, despite the PSA's provisions that such loans cannot be repurchased." (Def. Mem. at 22.) However, Defendant's notice argument fails for the reasons discussed *supra*, IV, and Defendant is likewise incorrect that liquidated and extinguished loans are not subject to repurchase.

Both parties agree that in the nearly five years between the Closing Date and the date Monarch made its first demand, some of the loans at issue were foreclosed upon and liquidated.

30

Specifically, in the event delinquency on a loan reaches the point where payments on a non-performing loan cannot be collected, the Master Servicer was required to "cause each Servicer (to the extent required under the related Servicing Agreement) to foreclose upon, repossess or otherwise comparably convert the ownership of Mortgaged Properties securing such of the Loans as come into and continue in default." (*Id.*)

According to DBSP, various provisions of the PSA confirm that such liquidated or extinguished loans were not intended for repurchase. First, once "non-performing" loans are liquidated, they cease to be a part of REMIC I. (PSA § 3.13.) Only a "Loan" from REMIC I, the primary trust fund created by the PSA, is subject to repurchase. (*Id.*); *See, e.g., WMC II*, 2012 WL 4511065, at *6 (holding that liquidated loans did not constitute "Mortgage Loans" under the PSA and were therefore not subject to repurchase). Second, when a loan is repurchased, the PSA requires the Trustee to "release or cause the applicable Custodian to release to [DBSP] the related Mortgage File and . . . [to] execute and deliver such instruments of transfer or assignment, in each case without recourse, representation or warrant" in order to "vest" in DBSP any such loan. (PSA § 2.3(a).) Defendant construes this provision as plainly stating that if a loan no longer exists, or is no longer an asset of the

31

Trust, the Trustee cannot satisfy this transfer obligation.
Finally, DBSP points to the PSA's definition of "Purchase
Price," which it asserts demonstrates that the parties did not
intend for loans that had been extinguished to be subject to the
repurchase obligation.  The "Purchase Price" consists of "100%
of the Principal Balance thereof as of the date of purchase,"
along with accrued interest and, where applicable, unreimbursed
servicing fees and expenses incurred by the Trustee in relation
to the breach at issue.  (PSA § 1.1.)  The PSA goes on to state
that "[t]he Principal Balance of a Liquidated Loan shall be
zero," and defines a Liquidated Loan as a "Loan as to which the
related Servicer has determined in accordance with its customary
servicing practices that all amounts which it expects to recover
from or on account of such Loan . . . have been recovered."[9]
(Id.) This, to DBSP, evidences that because the repurchase of
such loans would be $0, such repurchases were not intended.  See
WMC II, 2012 WL 4511065, at *6 n.9 (stating that the fact that
the repurchase price would be $0 even if the trustee could
demonstrate that liquidated loans were subject to repurchase
"further shows that the parties did not contemplate the

---

[9] The definition states that "[f]or purposes of this definition, acquisition
of a Mortgaged Property by the Trust Fund shall not constitute final
liquidation of the related Loan."  (PSA § 1.1.)

repurchase remedy as being applicable in the present circumstance").

Plaintiff's reading of the PSA leads to a different conclusion.  Plaintiff cites the definition of "Purchase Price" as a "Loan" that "relates to an REO property," where the definition of REO Property includes property that has been acquired by a servicer on behalf of the Trust via foreclosure. As such, Plaintiff asserts that this shows that even a loan that has gone through foreclosure is a "Loan," subject to repurchase requirements. Additionally, the inclusion of unpaid interest and unrecovered advances and servicing advances in the definition of "Purchase Price" would be nonsensical if the Purchase Price for a Liquidated Loan were $0. Moreover, Plaintiff contends that discovery and expert testimony will show that the sentence in the PSA staying the Principal Balance of  Liquidated Loan to be "zero" is there solely and exclusively for the purpose of Trust accounting, which requires a reconciliation to be performed on a monthly basis between the Trust's assets (the loans) and its liabilities (the Certificates).[10]

---

[10] The genesis of the language, Plaintiff contends, is a rating agency requirement that the Trust actually reflect the value of its holdings for purposes of determining the extent of overcollateralization in the securitization at any point in time and the appropriate rating (or ratings adjustment) at any point during the life of the Trust.  For purposes of determining the Purchase Price where the sponsor's repurchase obligation is at play, reference is appropriately had to Section 1.1 of the PSA.

Despite these apparent contradictions, DBSP asserts that its interpretations of the provisions in the PSA are unambiguous and should be given effect. *See Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 573 (2d Cir. 1993) ("If a contract is unambiguous, courts are required to give effect to the contract as written").  DBSP further asserts that because the agreements are "unambiguous," custom and practice is irrelevant. *See Polyfusion Elecs., Inc. v. AirSep Corp.*, 816 N.Y.S.2d 783, 785 (4th Dep't 2006).  Plaintiff, in turn, maintains that the PSA expressly and unambiguously requires repurchase even of liquidated loans, and that industry custom confirms any doubt as to the intent of the parties in defining the repurchase obligation.[11]  Further, though the PSA does not anywhere include

---

[11] To the extent custom and practice evidence is relevant, Plaintiff establishes that courts have expressly recognized that the "repurchase payment" is a "make-whole" payment and RMBS securitization sponsors have an obligation to make the securitization trust whole even on loans that have been liquidated or foreclosed upon.  Additionally, Plaintiff cites DBSP's practice in other cases as evidence of its awareness of this custom and practice regarding "repurchase." *See Wells Fargo V. Bank of Am.*, 2013 WL 1285289, at *10 (relevant case law and agreements make clear that a "repurchase provision is designed to shift the risk to the selling party . . . and [] such a provision is the appropriate method of making Plaintiff whole once a breach of warranty is established."). *See, e.g., Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.2d 458, 467 (2d Cir. 2010) (holding that even where a contract is unambiguous, if the parties use "specialized language," it conveys a "definite meaning" understood by those in the industry).  For the purposes of this motion, the Court does not reach whether this is sufficient to establish a monolithic custom and practice. *See British Int'l Ins. Co. Ltd. v. Seguros la Republica, S.A.*, 342 F.3d 78, 84 (2d Cir. 2003) (to be relevant, a custom or practice must be "so well settled, so uniformly acted upon, and so long continued as to raise a fair

a provision requiring DBSP to "make whole" payments for extinguished loans, or a provision requiring exclusion of liquidated or foreclosed loans from the repurchase obligation, both parties cite these respective absences as demonstrating unambiguous intent.  As evidenced, however, the document does not explicitly specify either way whether repurchase includes liquidated loans.

In any event, arguments by both parties as to the correct interpretation of the PSA provisions, and the relevance of industry custom, miss the mark.  "Even if DBSP were correct that Released, Charged Off, and Liquidated Loans are not subject to repurchase, dismissal would still not be warranted because DBSP needs to establish that all of the non-conforming loans fell into these defined categories. Discovery is necessary to make these determinations."  See ACE Securities Corp. Series 2006-SL2 v. DB Structured Products, Inc., 965 N.Y.S.2d 844, 849 (Sup. Ct. N.Y. Cty. 2013).[12]

---

presumption that it was known to both contracting parties and that they contracted in reference thereto").

[12] DBSP asserts that discovery is not necessary because there is no dispute that certain loans were paid off or liquidated in the last five years of its existence. (Defendant Reply Memorandum, "Def. Reply"; at 10.) DBSP does not allege, however, that all the loans at issue were liquidated or paid off, or even specific loans it believes "no longer exist." (Id.)  It is therefore premature to dismiss Plaintiff's specific performance claims merely because certain of the loans may or may not have been liquidated or foreclosed upon.

That being said, "[t]he whole point of how the MLPA and PSA [Agreements] were structured was to shift the risk of non-complying loans onto DBSP. The Representations and the Repurchase Protocol functioned as insurance for the Trustee and was likely priced accordingly." *Id.* DBSP's argument that loans in these categories are not subject to repurchase because they are no longer assets of the Trust (or that their defined Purchase Price is now $0) is therefore unconvincing. *See id.* As the court explained in *Ace Securities Corp.*,

> If DBSP were correct, it would be perversely incentivized to fill the Trust with junk mortgages that would expeditiously default so that they could be Released, Charged Off, or Liquidated before a repurchase claim is made. Indeed, if DBSP learned that loans were non-conforming and played a crafty game of accounting by moving them off the Trust's books to their own to evade their repurchase obligations, such actions would be a breach of the duty of good faith and fair dealing. Consequently, it is to no avail to contend that the non-conforming loans are long gone and the Trustee's repurchase rights have been extinguished by DBSP's actions.

*Id; see also Flagstar I*, 2011 WL 5335566, at *7-8 (holding that, because the transaction documents contained detailed provisions regarding "the circumstances in which Flagstar must convey the Transfer Deficiency to AGM, and the process by which it must do so," that amount could not "always necessarily be 'zero.'").

Indeed, foreclosure cannot be an alternative to a repurchase remedy for non-conforming loans of which DBSP breached its RWs; this implication would give DBSP the ability

36

to frustrate the Trust's repurchase remedy by delaying or
refusing to repurchase the breaching Mortgage Loans until the
servicer had, in mitigation of the Trust's losses, foreclosed on
them.  As the court in *Ace Securities Corp.* explains,

> [I]t is worth keeping in mind that DBSP does not bear the
> risk of loss on all loans that default. Conforming loans,
> where the Representations are true, will sometimes default
> for reasons that have nothing to do with borrowers lying or
> underwriter fraud. If "good" mortgages did not have real
> default risk, mortgage interest rates would be even lower
> than their current historically depressed levels. In
> reality, borrowers will occasionally default due to myriad
> unexpected circumstances, such as losing their job. In
> those cases, the Certificateholders bear the risk of loss
> and their recovery is limited to whatever proceeds can be
> obtained through foreclosure. In contrast, where, as here,
> borrowers allegedly defaulted due to the Representations
> being false, such risk is meant to be borne by DBSP. If, as
> DBSP contends, the Certificateholders' recovery on
> misrepresented loans is limited to foreclosure proceeds,
> the repurchase remedy would be virtually worthless.

965 N.Y.S.2d at 849.  Accordingly, Plaintiff's claim for
specific performance remains.[13]

## V. PLAINTIFF HAS SUFFICIENTLY ALLEGED A CLAIM FOR RESCISSORY DAMAGES

The FAC's second cause of action for "Fundamental Breach/
Rescissory Damages" asserts that DBSP has "defeated,"

---

[13] It is worth noting that if discovery confirms Plaintiff's allegations that
DBSP was aware of the breaches at the Closing Date, both parties have agreed
that DBSP would be required to pay the pre-liquidation Purchase Price, and
the concern over the value or a liquidated or foreclosed upon loan would
prove irrelevant.

"frustrated," and "fundamentally breached" the Agreements by "convey[ing] to the Trust a pool of Mortgage Loans that included a substantial portion of loans with material breaches" and by "fail[ing] to cure or repurchase any of the breaching Mortgage Loans." (Compl. ¶¶ 13, 37, 82, 117, 120.) The purpose of the creation of the Trust and the implementation of the PSA and MLPA was to "enable[e] DBSP to transfer to the Trust mortgage loans that DBSP wished to securitize and that would serve as the source of payment on the securities that DBSP intended the Trust to issue to investors." (FAC ¶ 111.) DBSP's breaches of the RWs, if as numerous and pervasive as Plaintiff alleges, would frustrate the fundamental purpose of the Trust by including hundreds of defective loans in the Mortgage pool. (Compl. ¶¶ 5, 7, 16-17, 43, 46-48, 59-64, 73-83.); *see also Canfield v. Reynolds*, 631 F.2d 169, 178 (2d Cir. 1980) (rescission available for breach of contract "so substantial as to strongly tend to defeat the object of the parties in making the contract").

Defendant asserts that rescissory damages are inappropriate (1) because Plaintiff's claim is grounded in contract and (2) because Plaintiff has failed, and indeed cannot, establish prerequisites to entitlement.

First, Plaintiff's claim is, as Defendant asserts, a "contract-based cause of action," and any damages or remedies

are thus "governed by the parties' written agreements." *MBIA Ins. Co. v. Residential Funding Co., LLC*, 2009 WL 5178337, at *7 (Sup. Ct. N.Y. Cty. Dec. 22, 2009); *see also Abele Tractor & Equip. Co., Inc. v. Varity Corp.*, 977 F. Supp. 1252, 1254 (N.D.N.Y. 1997) ("since the Agreement expressly limits recovery . . ., rescission of the contract would permit recovery above that for which the contract provides.  Thus, [plaintiff] contractually waived the right to the remedy of rescission under New York law.").[14]

Second, Defendant is likewise correct that rescissory relief is available "only where there is lacking a complete and adequate remedy at law."  *Rudman v. Cowles Commmc'ns, Inc.*, 30 N.Y.2d 1, 13(N.Y. 1972);  *New Shows, S.A. de C.V. v. Don King Prods., Inc.*, 2000 WL 354214, at *2 (2d Cir. Apr. 6, 2000) ("The harm plaintiff claims to have suffered is the financial loss it incurred. . . . Indeed, what [plaintiff] seeks through rescission is . . . payment for the net losses it suffered. . .

---

[14] Defendant is also correct that there is no basis in the contract or otherwise for Plaintiff's assertion that "the repurchase remedy . . . was never designed to resolve disputes over more than a handful of loans," and rescissory damages is therefore appropriate. (FAC ¶ 17.)  If the parties had intended to set a materiality threshold beyond which the repurchase remedy was no longer applicable, or to have otherwise provided for transaction-level remedies, they could and should have done so.  *See Reed v. Knollwood Park Cemetery*, 441 F. Supp. 1144, 1148 (S.D.N.Y. 1977) ("While this self-serving construction might accurately reflect the real intent . . ., the law in New York is clear that a court may not in the guise of interpreting a contract rewrite it to express the real intention of the parties if to do so would contradict the clearly express language of the contract.").

. But since the legal remedy in this case is adequate, the equitable remedy of rescission is simply inappropriate."); *New Paradigm Software Corp. v. New Era of Networks, Inc.*, 107 F. Supp. 2d 325, 330 (S.D.N.Y. 2000) (dismissing rescission claim because "Plaintiff has asserted no reason why damages would not be an adequate remedy").  Plaintiff in this case has pled the "adequate remedy at law" of DBSP's contractual obligation to repurchase the affected loans at the Purchase Price.[15]

Here, however, rescissory damages are pled in the alternative to Plaintiff's breach of contract claims. Additionally, "[w]hether [Plaintiff] may seek equitable remedies requires the Court to make factual determinations for which there is no support in the record at this stage." *Syncora Guaran tee Inc. v. EMC Mortg. Corp.,* No. 09 Civ. 3106, 2012 WL 2326068, at *10 (S.D.N.Y. June 20, 2012) (denying plaintiff's request for a ruling on the availability of rescissory damages at the motion for summary judgment stage).  As with compensatory damages, therefore, the issue of rescissory damages is premature. *See, e.g., Assured Guar. Mun. Corp. v. UBS Real Estate Sec. Inc.*, No. 12-cv-1579, 2012 WL 3525613, at *7 (S.D.N.Y. Aug. 15, 2012) (rejecting defendant's argument that

---

[15] Defendant's argument that rescission here will not ensure that the "status quo be substantially restored," presents factual issues premature at this stage.

"sole remedy" repurchase obligation precluded an award of
rescissory damages, ruling that "[i]t would be premature to
strike a remedy at the pleadings stage"); *Ambac Assur. Corp. v.
EMC Mortg. Corp.*, No. 08 Civ. 9464, 2009 WL 734073, at *2
(S.D.N.Y. Mar. 12, 2009) (denying motion to strike prayer for
rescissory damages because "the relief provided for plaintiff's
claims will be determined if any entitlement to remedies is
proved"); *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 898
(2d Cir. 1976) ("Since the District Judge sits as an equity
judge in this rescission action, it is for the court to fashion
the proper remedy after all the relevant facts have been
found.").[16] Defendant's request to dismiss Plaintiff's claim for
rescissory damages is thus denied.

## VI.  PLAINTIFF'S DECLARATORY JUDGMENT CLAIM IS DISMISSED

Plaintiff's fourth and fifth causes of action seek
declaratory judgment for "reimbursement of expenses" to the
Trustee for enforcing its rights under the contract.

"It is within the broad discretion of the trial court
whether to exercise declaratory jurisdiction." *Camofi Master LDC
v. Coll. P'ship, Inc.*, 452 F.Supp.2d 462, 480 (S.D.N.Y.2006)

---

[16] Defendant cites *MBIA Ins. Co. v. Countrywide Home Loans Inc*, 963 N.Y.S.2d
21, 22 (1st Dep't 2013) to show that New York courts routinely deny
rescissory damage claims.  There, however, the court held that the lower
court erred in granting *summary judgment* on the issue of rescissory damages.

(citing *Muller v. Olin Mathieson Chem. Corp.,* 404 F.2d 501, 505
(2d Cir.1968)).  However, "courts have found declaratory
judgment to be inappropriate where a party has already invoked
its right to a coercive remedy." *Piven v. Wolf Haldenstein
Adler Freeman & Herz L.L.P.*, 2010 WL 1257326, at *11 (S.D.N.Y.
Mar. 12, 2010); *see also Apple Records, Inc. v. Capitol Records,
Inc.*, 137 A.D.2d 50, 53 (1st Dep't 1988) ("A cause of action for
a declaratory judgment is unnecessary and inappropriate when the
plaintiff has an adequate, alternative remedy in another form of
action, such as breach of contract."); *Assured Mun. Guar. Corp.
v. UBS Real Estate Sec., Inc.*, 2012 WL 3525613, at *6 (S.D.N.Y.
Aug. 15, 2012) (same).  Here, as Plaintiff has already sought
coercive relief arising out of the same Agreements as its
request for declaratory judgment, Plaintiffs' request for
declaratory judgment is duplicative of its other claims.

Further, Plaintiff has not adequately alleged why
declaratory relief as to out-of-pocket expenses, including
Monarch's "Forensic Review," is necessary.  To the contrary,
Plaintiff has acknowledged its rights under the relevant
Agreements to pursue this remedy. (Compl. ¶ 84 ("In addition to
its cure, substitution and repurchase obligations, DBSP *further*
agreed to reimburse the Trustee for the expenses of enforcing
DBSP's obligations under the MLPA and the PSA.").) This fact in

42

itself makes declaratory judgment inappropriate.  *See, e.g.,*
*Apple Records, Inc. v. Capitol Records, Inc.,* 137 A.D.2d 50, 53
(1st Dep't 1988) ("A cause of action for a declaratory judgment
is unnecessary and inappropriate when the plaintiff has an
adequate, alternative remedy in another form of action, such as
breach of contract.").  Accordingly, Plaintiff's declaratory
judgment claims are dismissed.

**VII. CONCLUSION**

Based upon the conclusions set forth above, Defendants'
Motion to Dismiss is granted in part and denied in part.

It is so ordered.

New York, NY
July 2 3 , 2013

ROBERT W. SWEET
U.S.D.J.